The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on July 20, 2017, which may be different from its entry on the record.

**IT IS SO ORDERED.**

**Dated: July 20, 2017**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Case No. 16-12975 |
| | ) | |
| JAN H. GOLDBERG & | ) | Chapter 7 |
| LAURICE M. GOLDBERG, | ) | |
| | ) | Judge Arthur I. Harris |
| Debtors. | ) | |

### MEMORANDUM OF OPINION[1]

In this Chapter 7 case, the U.S. Trustee moved to dismiss the debtors' case pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3) for abuse based on bad faith and/or the totality of circumstances primarily because the debtors own and seek to keep three real properties – their residence and two other properties used for their skin care business and a part-time law practice. For the reasons that follow, the Court denies the U.S. Trustee's motion to dismiss.

---

[1] This Opinion is not intended for official publication.

## JURISDICTION

A motion to dismiss a bankruptcy case is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  This Court has jurisdiction over core proceedings pursuant to 28 U.S.C. §§ 157(a) and 1334 and Local General Order No. 2012-7, entered by the United States District Court for the Northern District of Ohio.

## PROCEDURAL HISTORY

On May 27, 2016, the debtors, Jan H. Goldberg and Laurice M. Goldberg, filed the above-captioned voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  On September 26, 2016, a meeting of creditors was held pursuant to 11 U.S.C. § 341(a), and, on December 8, 2016, the Chapter 7 trustee filed a report of no distribution (Docket No. 34).

Beginning on September 6, 2016, the U.S. Trustee filed a series of motions for extension of time to file a motion to dismiss or a complaint objecting to the discharge (*See* Docket Nos. 15, 20, 29, and 35).  The debtors did not oppose these motions, and the Court entered orders granting the motions (*See* Docket Nos. 18, 32, 37, and 40).

On November 16, 2016, the U.S. Trustee filed a motion for an order authorizing the examination of the debtors and directing production of certain documents (Docket No. 24).  On November 17, 2016, the Court entered an order

2

granting the examination motion (Docket No. 26). On January 11, 2017, the

U.S. Trustee began the Rule 2004 examination of the debtors. The examination

was continued to and concluded on February 23, 2017.

On March 10, 2017, the U.S. Trustee filed a motion to dismiss the case for

abuse pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3) (Docket No. 43). On

April 4, 2017, the debtors filed a response in opposition to the U.S. Trustee's

motion to dismiss (Docket No. 46).

On June 27, 2017, the Court held an evidentiary hearing on the motion to

dismiss. The Court heard testimony from one of the debtors,

Laurice M. Goldberg. The Court received without objection the U.S. Trustee's

Exhibits A and B. The Court also received the debtors' Exhibits 1 through 21

over the U.S. Trustee's objection, and the Court received the debtors' Exhibits 23

and 24 without objection.

## FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the

Court's weighing of the evidence, including the credibility of each witness. In

doing so, "the court considered the witnesses' demeanor, the substance of the

testimony, and the context in which the statements were made, recognizing that a

transcript does not convey tone, attitude, body language, or nuance of expression."

3

*In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of the trial witness, exhibits admitted into evidence, and any stipulations. Unless indicated otherwise, the following facts were established at trial by a preponderance of the evidence or were stipulated to by the parties.

The parties submitted the following stipulations:

1. On May 27, 2016 (the "Petition Date"), Debtors filed a joint voluntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). *See* Docket No. 1.

2. Debtors' bankruptcy petition identifies their debts as primarily consumer debts. *See* Docket No. 1.

3. Debtor Laurice Goldberg is 68 years old.

4. Debtor Laurice Goldberg owns and operates The Laurice Skin Care & Cosmetics LLC (the "Skin Care Business"), of which she is the sole owner. She also is an attorney with a law practice. She is also both a licensed real estate broker and a licensed real estate agent.

5. Debtor Jan Goldberg is 61 years old. Debtor Jan Goldberg assists Laurice Goldberg in the Skin Care Business but he has no independent income.

6. Debtors' monthly income/expenses as of the time of the Petition are set forth on *Schedules I: Your Income & J: Your Expenses* of the petition. *See* Docket No. 1, pp. 38-41.

7. Debtors list secured claims totaling $681,906.99, which includes several mortgages secured by Debtors' Primary Home and the Lorain Properties. *See* Docket No. 1, pp. 23-25.

4

8. As of the Petition Date, Debtors' combined monthly net income is $5,952. *See* Docket No. 1, pp. 38 - 39. Debtors' monthly income includes net income from the Skin Care Business, income from their law practice (Attorney Laurice M. Koury), gift from the Debtor Laurice Goldberg's mother, and social security compensation. *Id*.

9. Specifically, Debtor Laurice Goldberg receives $860 in monthly social security benefits. *See* Docket No. 1, pp. 38-39.

10. Also, Debtors receive at least $1,000/month as a gift from Debtor Laurice Goldberg's mother. *See* Docket No. 1, pp. 38-39.

11. Debtors own three pieces of real properties: (a) their primary residence located at 18375 Bent Tree Lane, Chagrin Falls, Ohio (the "Primary Home") listed on the petition with a value of $383,600; (b) 51883 Telegraph Road, Amherst, Ohio 44001 (the "Telegraph Rd Property") listed on the petition with a value of $136,810; and (c) 1014 West 4th Street, Lorain, Ohio 44052 (the "West 4th Street Property") listed on the petition with a value of $45,620.

12. The Telegraph Rd Property and the West 4th Street Property are hereinafter referred to jointly as the "Lorain Properties."

13. Debtor Laurice Goldberg also rents space to operate the Skin Care Business, which is located at 31100 Pinetree Road, Pepper Pike, OH 44124. She pays $800 per month plus utilities for the space.

14. As of the Petition Date, Debtors' mortgage balance regarding the Primary Home was $388,872 ($330,221 (first mortgage) + $58,651 (second mortgage)). *See* Docket No. 1, pp. 23-25. Debtors' schedules list the value of the Primary Home as $383,600. *Id*.

15. As of the Petition Date, Debtors' monthly mortgage payments for the Primary Home totals $3,380 ($2,909 (first mortgage) + $471 (second mortgage)). *See* Docket No. 1, pp. 40-41.

16. As of the Petition Date, Debtors list the current value of the Telegraph Rd Property as $136,810, and [list the] amount of the two mortgages that it secures as

5

$198,187 ($151,787 (first mortgage) + $46,400 (second mortgage)). *See* Docket No. 1, pp. 10-12; 23-25.

17. Currently, Debtors' monthly mortgage payments for the Telegraph Road Property totals $1,126 ($976 (first mortgage) + $150 (second mortgage)).

18. As of the Petition Date, Debtors list the current value of the West 4th Street Property as $45,620, and [list the] amount of the debt it secures as $76,715.99. *See* Docket No. 1, pp. 10-12; 23-25.

19. Currently, Debtors' monthly mortgage payment for the West 4th Street Property is $500.

20. The monthly expenses related to the Lorain Properties are approximately $2,974 per month as follows:

**Telegraph Rd Property**

| | |
|---|---|
| First Mortgage | $976 ($960 at time of filing) |
| Second Mortgage | $150 |
| Taxes (which includes taxes for the West 4th St Property) | $340 |
| Insurance | $166 |
| Utilities & Maintenance | $450 (U.S. Trustee has calculated $300 for utilities – maintenance is included here) |
| **Total:** | **$2,082** |

**West 4th St Property**

| | |
|---|---|
| Mortgage | $500 |
| Insurance | $42 |
| Utilities & Maintenance | $350 (U.S. Trustee has calculated $300) |
| **Total:** | **$892** |

21. There is no equity in either the Primary Home or the Lorain Properties.

6

22. As of the Petition Date, the Internal Revenue mortgage/rent standard for a household size of two in the county of Geauga, Ohio is $1,312.

23. The Debtors Schedule B22 form (the "Means Test") indicates that "[t]here is no presumption of abuse". *See* Docket No. 1, pp. 54-55. Based on the information included on the Debtors' Means Test, the U.S. Trustee is not seeking dismissal of the Debtors' case pursuant to section 707(b)(2) of the Bankruptcy Code.

At the evidentiary hearing, debtor Laurice Goldberg testified that both of the debtors have health problems for which they receive treatment. The debtors' primary source of income is their skin care business. The skin care business brings in $2,892 per month of net income (Docket No. 1). This figure accounts for the expenses of running the business, including the expenses from owning and maintaining the two Lorain Properties and leasing the Pinetree Rd Property.

Mrs. Goldberg also testified that the debtors deduct one third of their residence costs as a home office deduction. These costs include utilities, taxes, insurance, and interest accrued on the mortgage. These costs do not include the mortgage on the home.

Mrs. Goldberg also has a part-time law practice that provides a varied monthly income. On their Schedule I, the debtors reported $1,200 monthly income from the part-time law practice, but Mrs. Goldberg testified that it is more accurately around $1,000 per month. At the 2004 Examination, Mrs. Goldberg

7

stated that she made $200 to $300 from the part-time law practice. Mrs. Goldberg explained that estimation was for the month of January 2017, but later in the year the part-time law practice brought in more fees. Mrs. Goldberg testified that she has cut back on her law practice.

Mrs. Goldberg started the skin care business in the early 1980s. The business grew to the point that Mr. Goldberg quit his job in 2002 to help with the business. The business stopped growing and declined when the recession hit in the late 2000s. The debtors used their savings and retirement to keep the business running. The debtors also took out a second mortgage and used credit cards to keep the business running.

The debtors operate the skin care business out of the Lorain Properties and the Pinetree Rd Property. The West 4th Street Property is used as an office, showroom, and client meeting space, as well as an office for the part-time law practice. The Telegraph Rd Property is used as the distribution center, where products in bulk are repackaged and labeled for sale. The debtors also store product at the Telegraph Rd Property inside the house and in a pole barn on the property. For sanitary and security reasons, the distribution center must be kept separate from the client meeting space. The rented Pinetree Rd Property is used as a showroom and client meeting space for clients on the East side of Cleveland.

8

Mrs. Goldberg testified that this additional space is necessary for clients on the East side who would be unwilling to travel to the West side.

Mrs. Goldberg credibly testified that the total space of the Lorain Properties and the Pinetree Rd Property was necessary for the skin care business and the part-time law practice and that the debtors could not consolidate the businesses into fewer properties. Nor did the U.S. Trustee offer evidence to establish that the debtors could generate the same net income from their businesses either by surrendering one or more of the properties or by using more leased space. In fact, Mrs. Goldberg provided information from the multiple listing service indicating that leasing comparable properties would be more expensive than the current cost of owning and maintaining the Lorain Properties and leasing the Pinetree Rd Property (Exhibits 23 and 24).

CONCLUSIONS OF LAW

The U.S. Trustee has moved to dismiss the debtors' case for abuse under 11 U.S.C. § 707(b)(3). Section 707(b)(3)(A) allows the court to dismiss an individual debtor's case if the debtor's debts are primarily consumer debts and if the debtor filed the petition in bad faith. Alternatively, section 707(b)(3)(B) allows the court to dismiss an individual debtor's case if the debtor's debts are primarily consumer debts and if, considering the "totality of the circumstances of

9

the debtor's financial condition," the granting of relief would be an abuse of the provisions of Chapter 7.

The burden of proof rests on the U.S. Trustee to demonstrate abuse by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279 (1991) (preponderance-of-the-evidence standard presumed to be applicable in civil actions between private parties).

## *I. Debts Are Primarily Consumer*

Section 707(b)(1) only permits the dismissal of a case filed by an individual debtor whose debts are primarily consumer debts. The debtors marked on their petition that their debts were primarily consumer debts (Docket No. 1, pg. 6), and the parties have stipulated that the debtors' debts are primarily consumer debts. Stipulation #2.

Based on the evidence presented, the Court questions whether the debtors' debts are indeed primarily consumer debts, but the Court is bound by the parties' stipulations. For example, the record suggests that the $276,000 owed on the Lorain Properties, the $58,000 owed on the second mortgage taken out for business purposes, and the business portion of the credit card debt may well exceed the debtors' consumer debts. Nevertheless, the Court accepts the parties' stipulation that the debtors' debts are primarily consumer debts.

10

## II. Bad Faith

Section 707(b)(3)(A) allows the court to dismiss an individual debtor's case if the debtor's debts are primarily consumer debts and if the debtor filed the petition in bad faith. In this case, there was no evidence of false statements or extravagant purchases, such as expensive furnishings, jewelry, or vehicles. The U.S. Trustee offered an inference of dishonesty from the debtors' filing of their bankruptcy petition with the intent to retain all three real properties that have no equity, while also seeking a discharge of their debts. The U.S. Trustee compared the debtors' retention of the Lorain Properties to the retention of investment properties that lost money each month. *See In re Amos*, 452 B.R. 886 (Bankr. D. N.J. 2011) (court found bad faith where debtors sought to retain rental property in the Poconos that lost money each month). In the present case, however, the Lorain Properties are not investment properties that lose money each month. After paying the costs of owning and maintaining these two properties for their businesses, the debtors have a net gain – not a net loss. The U.S. Trustee's evidence is insufficient to support a finding of bad faith.

## III. Totality of Circumstances

Alternatively, the U.S. Trustee seeks dismissal of the debtors' case under Section 707(b)(3)(B). Subsection 707(b) was substantially revised by the

11

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).

Under former subsection 707(b), the standard for dismissal was "substantial

abuse."  While the Bankruptcy Code did not define "substantial abuse," the

Sixth Circuit had held that "in seeking to curb 'substantial abuse,' Congress meant

to deny Chapter 7 relief to the dishonest or non-needy debtor."  *In re Behlke*,

358 F.3d 429, 434 (6th Cir. 2004) (quoting *In re Krohn*, 886 F.2d 123, 126

(6th Cir. 1989)).  Whether granting Chapter 7 relief was a "substantial abuse" was

determined from the totality of the circumstances, and a court could find

substantial abuse based on either lack of honesty or want of need.  *See Behlke*,

358 F.3d at 434.

Current subparagraph 707(b)(3)(B) closely tracks the Sixth Circuit's prior

precedents by directing the bankruptcy court to consider the "totality of the

circumstances of the debtor's financial condition."  This suggests that *Krohn* and

*Behlke* are still good law, at least to the extent that facts constituting "substantial

abuse" under *Krohn* and *Behlke* based on a debtor's "want of need" would also

constitute "abuse" under the "totality of the circumstances" of 11 U.S.C.

§ 707(b)(3)(B).  *See In re Violanti*, 397 B.R. 852, 855 (Bankr. N.D. Ohio 2008)

(stating that the grounds for dismissal under section 707(b)(3) are a codification of

pre-BAPCPA case law); *In re Mestemaker*, 359 B.R. 849 (Bankr. N.D. Ohio 2007)

(applying *Krohn* and *Behlke* to § 707(b)(3)(B)); *In re Lenton*, 358 B.R. 651 (Bankr. E.D. Pa. 2006) (noting that pre-BAPCPA cases, including *Krohn*, are still good law).

Therefore, in analyzing the "totality of the circumstances of the debtor[s'] financial condition" to determine whether "abuse" exists under 11 U.S.C. § 707(b)(3)(B), the Court will consider the same factors that the Sixth Circuit established in *Krohn* and *Behlke* for analyzing the "totality of the circumstances" to determine whether "substantial abuse" existed under former subsection 707(b). These factors include: the debtors' "ability to repay [their] debts out of future earnings," "whether the debtor[s] enjoys a stable source of future income," "whether [the debtors are] eligible for adjustment of [their] debts through Chapter 13," "whether there are state remedies with the potential to ease [the debtor's] financial predicament," "the degree of relief obtainable through private negotiations," "whether [the debtors'] expenses can be reduced significantly without depriving [them] of adequate food, clothing, shelter and other necessities," and "whether debtor[s'] financial situation is the result of an unforeseen catastrophic event." *Behlke*, 358 F.3d at 434, 437 (citing *Krohn*, 886 F.2d at 126-28).

13

*A. Debtors' Ability to Repay Debts out of Future Earnings*

In analyzing "totality of the circumstances . . . of the debtor[s'] financial situation" under 11 U.S.C. § 707(b)(3)(B), a major factor is the debtors' ability to repay a significant portion of their debts out of future earnings. Courts can determine a debtor's ability to repay by calculating whether the debtor would have sufficient income to fund a Chapter 13 plan. *See Behlke*, 358 F.3d at 435.

Social security income is not included in a Chapter 13 debtor's projected disposable income. *Baud v. Carroll*, 634 F.3d 327, 345 (6th Cir. 2011). However, in assessing the debtors' ability to repay, some courts consider the debtors' social security income. *In re Booker*, 399 B.R. 662, 667 (Bankr. W.D. Mo. 2009). *See also In re Calhoun*, 396 B.R. 270 (Bankr. D.S.C. 2008) (holding that the Court could consider social security income in section 707(b)(3) context) *subsequently aff'd by Calhoun v. U.S. Tr.*, 650 F.3d 338 (4th Cir. 2011).

Other courts have refused to consider social security income in a section 707(b)(3) analysis. *See In re Suttice*, 487 B.R. 245, 254 (Bankr. C.D. Cal. 2013) ("Congress intended social security benefits to be protected from inclusion in a § 707(b)(3)(B) analysis, based upon § 407(a) of the Social Security Act and as shown by the Debtors' social security income being definitively excluded from the means test of § 707(b)(2)."). *See also In re Moriarty*, 530 B.R. 637, 644

14

(Bankr. W.D. Va. 2015) (totality of circumstances of debtor's financial situation does not include social security income).

In *Baud*, the Sixth Circuit recognized that in the good-faith analysis under 11 U.S.C. § 1325(a)(3) courts are split on whether a bankruptcy court may consider a debtor's decision not to commit social security income to unsecured creditors. *Baud*, 634 F.3d 327, n.13. The Sixth Circuit did not reach this issue because the debtors in *Baud* had devoted their social security income to unsecured creditors. *Id*.

This Court does not need to determine if social security income should be included in the analysis of the debtors' ability to repay their debts. Even if the debtors' social security income and the monthly $1,000 gift from Mrs. Goldberg's mother were included in the debtors' income calculations, the debtors' expenses still exceed their average monthly income by $516. Docket No. 1. Therefore, no funds would be available to pay general unsecured creditors in a Chapter 13 plan. The U.S. Trustee did not prove by a preponderance of the evidence that the debtors could significantly reduce their expenses to fund a Chapter 13 plan without losing income from their businesses. The U.S. Trustee's only suggestion to reduce expenses was to cut back on the cost of owning and maintaining the debtors' three real properties – their residence and the two Lorain Properties used

15

for their skin care business and part-time law practice.

With respect to the residence, the U.S. Trustee only offered evidence that the cost of owning and maintaining the residence far exceeded the Internal Revenue Standard for mortgage/rent for a household size of two in Geauga County, Ohio. However, the U.S. Trustee did not offer any other evidence such as the median price of homes in Geauga County or whether the debtors' residence was in the top one-third, top ten percent, or some other segment. As the bankruptcy court noted in *In re Lorenca*, 422 B.R. 665, 672 (Bankr. N.D. Ill. 2010):

> [I]t is not clear that Congress intended the IRS housing allowance as a standard for determining reasonable housing costs. The IRS housing allowance operates as a floor: all debtors are entitled to at least the amount of the standard when calculating the means test, but if a particular debtor pays a higher amount on a mortgage, then that debtor is entitled to the higher amount. See 11 U.S.C. § 707(b)(2)(A). . . . Indeed, many in the middle class live in houses now worth a half-million dollars. It is all too simple to base the label "luxury" merely upon a stated home value and thereby justify an order to people to leave their home so as to provide maximum possible payment to creditors without proof of some invidious act or planning by the Debtors in acquiring that property. . . . Neither Debtors nor the U.S. Trustee supplied any evidence that might relate to the issue. But since the U.S. Trustee has the burden of proof on the issue, the lack of evidence tends to undermine his case.

With respect to the two Lorain Properties, the U.S. Trustee has failed to establish that the debtors can generate the same net income from their businesses

16

either by surrendering one or both properties or by using more leased space.
Unlike the situation in *Lorenca*, where the investment property generated no income, in the present case, the record establishes that the existing costs of owning and operating the Lorain Properties are needed to generate the debtors' net income from their skin care business and part-time law practice. And while it is certainly conceivable that the debtors could operate their businesses with less expensive space, including less space, the U.S. Trustee has failed to offer credible evidence to establish this by a preponderance of the evidence.

During the evidentiary hearing, there was much testimony and argument over whether the debtors' photos were representative of the space utilized by their businesses. And while the photos themselves fairly depicted the items shown – *e.g.*, skin care products and bulk product on storage racks, product in a refrigerator, two folding chairs and card table in a room, and seasonal displays in storage – the photos themselves generally fail to show how cramped or uncramped the space is in the debtors' properties. The U.S. Trustee could have viewed the premises and taken photos, but apparently chose not to do so. Nor did the U.S. Trustee successfully rebut Mrs. Goldberg's testimony, which the Court found generally to be credible, that both Lorain Properties are needed for their skin care business and part-time law practice, and that leasing alternative space would yield

17

no net savings.

### B. Whether Debtors Enjoy a Stable Source of Future Income

Another factor used to analyze the totality of the circumstances of a debtor's financial condition is whether the debtor enjoys a stable source of future income. Mrs. Goldberg testified that she has been cutting back on her legal practice. In addition, while the skin care business is the debtors' main source of income, the business has been in decline since the recession. Given the age and health of the debtors, it is unlikely that their disposable income is likely to increase significantly over the next three to five years, and may well decrease.

### C. Debtors' Eligibility for Chapter 13 and Ability to Fund Chapter 13 Plan

It appears that the debtors would be eligible for adjustment of their debts through Chapter 13. The debtors list $215,000 in noncontingent, liquidated, unsecured debt, which is below the $394,725 maximum set by 11 U.S.C. § 109(e). The debtors list $681,000 in noncontingent, liquidated, secured debt, which is below the $1,184,200 maximum set by 11 U.S.C. § 109(e).

As previously stated, the debtors' expenses exceed their average monthly income by $516 (Docket No. 1). Therefore, no funds would be available to pay general unsecured creditors in a Chapter 13 plan. The U.S. Trustee failed to establish that the debtors could fund a Chapter 13 plan that would provide a

18

dividend to unsecured creditors of $12,850 or $214.17 per month, *see* § 707(b)(2)(A)(i)(II), or any dividend at all.

## D. Other Factors

Other factors courts consider in determining the totality of circumstances, include "whether there are state remedies with the potential to ease [the debtors'] financial predicament," "the degree of relief obtainable through private negotiations," "whether [the debtors'] expenses can be reduced significantly without depriving [them] of adequate food, clothing, shelter and other necessities," and "whether debtor[s'] financial situation is the result of an unforeseen catastrophic event." *Behlke*, 358 F.3d at 434, 437 (citing *Krohn*, 886 F.2d at 126-28).

The U.S. Trustee did not prove by a preponderance of the evidence that any of these other factors weighed in favor of dismissing the debtors' case. The U.S. Trustee's only suggestion to reduce expenses was to cut back on the cost of owning and maintaining the debtors' three real properties – their residence and the two Lorain Properties used for their skin care business and part-time law practice. As explained previously, the only evidence regarding the debtors' residence was that the cost of owning and maintaining the residence was 2.6 times the Internal Revenue Standard for mortgage/rent for a household size of two in

19

Geauga County, Ohio.

The U.S. Trustee relied on two cases to support the claim that the debtors'
housing expense was excessive and constituted abuse. However, both of those
cases had additional factors that supported a finding of abuse that this current case
lacks. In *In re Durczynski*, the court found that the debtors' housing expense that
was 2.5 times the amount allowed under the means test was excessive.
405 B.R. 880, 884 (Bankr. N.D. Ohio 2009). However, the debtors in *Durczynski*
also scheduled $1,150 per month in food expenses, claimed pool upkeep expenses
as necessary, and had equity in the residence. *Id*. at 883, 885. In addition, the
debtors were young with no significant health issues, and one of the debtors only
worked part-time. *Id*. at 887. In *In re Ramsay*, the court found that the debtor's
housing expense that was 3 times the amount allowed under the means test was
excessive. 440 B.R. 85 (Bankr. M.D. Pa. 2010). However, the debtor in *Ramsay*
also scheduled $1,128 per month in car expenses for a luxury SUV and provided
voluntary financial support to his fiancée and her children. *Id*. at 92.

In the present case, the debtors ran into financial difficulty only after their
skin care business suffered from the consequences of the great recession. In an
effort to save the business, they used their savings, the equity in their three real
properties, and credit cards. Given the debtors' ages and not-so-perfect health,

coupled with the other uncertainties of their businesses, it would be difficult to conclude that the debtors have excellent prospects when it comes to future income. *Cf. In re Mooney*, 313 B.R. 709, 718 (Bankr. N.D. Ohio 2004) (noting three compelling factors: debtors have excellent incomes, have excellent future prospects, and can make a meaningful effort at repayment). With respect to the two Lorain Properties, the U.S. Trustee has failed to establish that the debtors can generate the same net income from their businesses either by surrendering one or both properties or by using more leased space. The debtors may well lose one or more of their three properties, all of which are currently "underwater;" however, the U.S. Trustee has failed to demonstrate how surrendering one or more of these properties or other "belt-tightening" efforts would yield any dividend to unsecured creditors in a Chapter 13 case.

In short, the U.S. Trustee has failed to prove by a preponderance of the evidence that, considering the totality of the circumstances of the debtors' financial condition, granting relief would be an abuse of the provisions of Chapter 7.

## CONCLUSION

For the reasons stated above, the Court denies the U.S. Trustee's motion to dismiss under 11 U.S.C. 707(b).

IT IS SO ORDERED.